

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 10, 2014**

_____
United States Bankruptcy Judge
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SCH INVESTMENTS, LLC, | § | CASE NO. 14-31164-SGJ-11 |
| | § | |
| DEBTOR. | § | |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONDITIONING AUTOMATIC STAY

On May 28, 2014 and June 3-June 4, 2014, the court held a hearing (the "Hearing") on a Motion for Order Granting Relief from the Automatic Stay [DE # 32], and related Motion regarding the applicability of Section 362(d)(3), to the above-referenced Debtor [DE #33] (collectively, the "Motions"). Both Motions were filed by a secured creditor known as 7636 Harwin, LLC (the "Movant") in the above-referenced bankruptcy case (the "Bankruptcy Case"). The Motions were opposed, as set forth below. This constitutes the court's findings of fact and conclusions of law, pursuant to Fed. Rs. Bankr. Proc. 7052 and 9014. The court has authority to

exercise jurisdiction and enter a final order in this bankruptcy core matter, pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(G).

I. **Background.**

The Movant desires that the automatic stay be lifted, pursuant to section 362(d) of the Bankruptcy Code, to allow the Movant to exercise its rights and remedies with regard to its collateral, which collateral consists of approximately 6.7 acres of real property at 7636 Harwin Drive, Houston, Harris County, Texas (which is in the so-called Westwood/Bellaire retail submarket of the Greater Houston Retail Market), on which there has been partial construction of what was intended to be an outlet retail shopping mall.[1] To be specific, there is: (a) approximately 2.16 acres of land on which there has been constructed one building with 17 units that are mostly finished and ready for occupancy (the units are missing only certain items like flooring and air conditioning), and (b) an adjacent roughly 4.34 acre tract of land, on which a future building 2 and 3 were intended but never built, and this adjacent land has only been partially prepared for future construction, with such things as a concrete slab, and site work for utilities and parking lots. Hereinafter, the court will refer to this collateral in its entirety as the "Property" and, when referring to the building with the mostly finished units, the court will use the term "Building 1" and "Units" or "Units 1-17," as appropriate. The barely developed property adjacent to Building 1 will be referred to sometimes as the "Adjacent Real Property." It should be noted that the Debtor had the intention of marketing the Property as a *Condominium Retail Project*, meaning the Units would be individually *sold* to buyers, rather than individually *rented or leased*. Units 1-17 comprise 60,321 square feet of space.

By way of further background, the Debtor filed a voluntary Chapter 11 bankruptcy case on March 4, 2013. The Debtor's sworn Statement of Financial Affairs [DE #27], filed March 27,

---

[1] The Debtor has represented that the Debtor is headquartered in Dallas, Texas.

2014, of which this court takes judicial notice, reflected at Question 21 that there are three equity owners that each own 33.3% of the Debtor: Amir Hussain, Rajiv Chhabra, and Rajinder Singh. The evidence reflected that these three equity owners are guarantors on Movant's debt. Mov. Exs. A-6 through A-8. The Debtor's sworn Schedules [DE #26], filed March 27, 2014, of which this court takes judicial notice, reflected a current value of the Property of $15,000,000 (Schedule A) and reflected that no other assets are owned by the Debtor. The Schedules also reflected approximately $14,268,979.68 of secured indebtedness against the Property, held by the following claimants in the following amounts: Movant with a scheduled $10 million claim; AZA Investments, LLC (hereinafter, "AZA") with a scheduled $750,000 claim; A & Skipol, Inc. with a scheduled $1.6 million claim; Royal Bengal Construction with a scheduled $918,979.68 claim; and Target Builders, LLC with a scheduled $1 million claim. There are various vendors and insider claimants listed on Schedule F as well. No executory contracts are listed.

Most relevant to Movant's Motions that are now before the court are the claims and arguments of the Movant and of AZA–the Debtor having sat silent during the Hearing on this dispute. These two claimants' positions can be summarized as follows. Movant asserts that it was owed an aggregate $10,853,070, as of the Petition Date, and was owed $11,211,536.44, as of May 28, 2014 (Mov. Ex. I), reflected by loans made in several different stages or traunches to the Debtor. First, Movant purchased a note held by Metro Bank, N.A., in or around December 2011, on which $4.7 million was then owing ("First Movant Loan"). Then, Movant itself made a Second Loan to the Debtor for $1.8 Million ("Movant Second Loan"). Movant then made a Third Loan to the Debtor for $400,000 ("Movant Third Loan"). Movant also later made three further advances under the Movant Second Loan, through modifications and extensions thereto. In other words, there is a second, third, and fourth traunche of debt under the Movant Second

Loan. Movant also contributed equity as a limited partner, although the Debtor did not list Movant as an equity owner in its Statement of Financial Affairs. *See* Mov. Exs. A1-30.

Meanwhile, claimant AZA asserts that it is owed $1,360,000 by the Debtor. AZA actually has a unique interest that it asserts in this Bankruptcy Case. Specifically, AZA tendered $1 million to the Debtor on or about May 5, 2011, to purchase, at least initially, ten Units, in Building 1, and still more units in the never-constructed Building 2. AZA Ex. 1. AZA is asserting an equitable interest in the Property under a contract for sale. AZA's interest in the Property was recorded in the Harris County Property records on May 17, 2011. AZA Ex. 1. Only the Movant's First Loan (actually made by its predecessor-in-interest Metro Bank, N.A.) preceded AZA's transaction in time. AZA acknowledges that it subordinated its rights to the Movant at or after Movant's Second Loan to the Debtor (at which time Movant held $6.5 million of secured indebtedness against the Debtor), but AZA asserts that it did not subordinate its interest as to any future unnoticed loans made by Movant. *See* AZA Ex. 2. Thus, AZA argues that only $6.5 million of Movant's secured debt is senior to AZA's. The court believes the evidence supports this position of AZA. *See* AZA Ex. 2. The court believes that AZA Ex. 2 and certain other related documents are somewhat ambiguous, and the court can look to extrinsic evidence as to the intent of the parties. AZA's witness was the only witness that provided testimony to supplement the intent of the parties–there being no Debtor-witness, and the witness for Movant was mostly unfamiliar with the subordination documentation. AZA's witness testified that the intent of the parties was that AZA would only be subordinated to $6.5 million of Movant's indebtedness and any other loans and subordination would have to be noticed to AZA, which never happened. The court found this testimony plausible, credible and unrefuted. In any event, Movant argues that AZA had a mere executory contract that could be rejected by the

4

estate, not any type of protectable lien or interest in the Property. AZA argues that it had an equitable lien or interest in the Property. The court agrees with AZA's position. *See Johnson v. Wood*, 157 S.W.2d 146, 148 (Tex. 1941); *Cadle Co. v. Harvey*, 46 S.W.3d 282, 287-88 (Tex. App.—Fort Worth 2001, pet. denied); *Longoria v. Lasater*, 292 S.W.3d 156, 165 (Tex. App.—San Antonio 2009, pet. denied). The court further notes that, even if AZA had a mere executory contract, it would presumably have rights that it could assert as a lienholder pursuant to section 365(j) of the Bankruptcy Code.

During the middle of the hearing on the Movant's Motion to Lift Stay, AZA filed an Adversary Proceeding against Movant, seeking a declaratory judgment as to the extent, validity, amount, and priority of AZA's interests versus Movant's interests. AZA also seeks the relief of marshaling and equitable subordination as to Movant.

But Movant argued that the automatic stay should be lifted, asserting that the Debtor has no equity in the Property (and, in fact, asserts that there is no equity above the claims of Movant) and that the Property is not necessary to an effective reorganization. The Movant has also argued lack of adequate protection in that there is not sufficient insurance on the Property and the Property is not being properly maintained and secured from vandalism and other harm, and it may be declining in value because of that. Movant also argued that the Debtor is a "single asset real estate" debtor, pursuant to section 101(51B) of the Bankruptcy Code, and that, therefore, the Movant is entitled to stay relief, pursuant to the provisions of section 362(d)(3) of the Bankruptcy Code, unless monthly payments are immediately commenced to Movant, as addressed in that Code section. The Debtor has no cash to make adequate protection payments of any kind.

The Debtor originally opposed the relief sought by Movant but had a sudden change in strategy, a few days prior to the Hearing (which "change in strategy" will be further elaborated upon later), and so remained silent during the Hearing on this matter. AZA opposed the Movant's Motions, arguing that there is equity in the Property for AZA, and that it will be unfairly deprived of its equity if the Movant is allowed to exercise its state law rights and remedies as to the Property. AZA also argued that Movant has unclean hands. AZA also argued that the Debtor is not a single asset real estate Debtor. Two junior lienholders (A & Skipol, Inc. and Royal Bengal Construction) also orally opposed stay relief through counsel at the Hearing, although they did not file written objections.

## II.    A Rosy Start.

The beginning of this case looked somewhat hopeful for creditors. Specifically, not only did the Debtor schedule the Property at a value of $15 million, but the Debtor fairly quickly filed motions to sell certain Units in Building 1 for prices that seemed favorable for all stakeholders. On March 12, 2014, [DE #14], the Debtor filed a Motion to sell three Units in Building 1–specifically Unit 105 for $578,000 to a buyer named Nworen Hussain, pursuant to a contract that was dated December 31, 2013 (prepetition), and Units 101 and 102 for a price of $1,232,330 to a buyer named Harwin Outlet Mall Ambashis Accessories, LLC, pursuant to a contract that was dated January 22, 2014 (also prepetition). Then, on April 7, 2014, [DE # 35], the Debtor filed a Motion to sell two more Units in Building 1–specifically Units 108 and 109 for a price of $1,084,800 to a buyer named Yasii Management, pursuant to a post petition contract dated March 26, 2014. Thus, it looked as though the Debtor would be in a position to monetize five of its 17 Units fairly quickly into the Chapter 11 case, for an aggregate price of $2,895,130 (which calculates to an average of $579,026 per unit). The Debtor's counsel represented at a hearing on

the record during this case that the hope was to use sale proceeds from these sales to pay down some debt and then obtain some new post petition financing pursuant to which it could reorganize.

Things quickly went downhill in this case.

Among other things, it was brought to the court's attention that the Property was not sufficiently insured. Rather, only a Builder's Risk insurance policy existed on the Property (obtained by the builder/contractor, not the Debtor) until Movant obtained yet additional insurance coverage at its own expense. Movant filed two Motions to lift stay and asked to take Rule 2004 examinations of the three Debtor principals. Then, on the day that the Rule 2004 examinations were scheduled to commence, just days before Movant's Motions were set to be heard, the Debtor suddenly filed withdrawals of the sale motions and also filed a motion to dismiss the Chapter 11 case. When the court convened the Hearing on the Movant's Motions on May 28, 2014, the court was apprised by counsel for the Debtor and Movant that the Debtor now agreed to the stay relief, and the parties had reached an overall compromise that contemplated that: (a) the Debtor would not oppose relief from the stay in favor of Movant; (b) the Debtor would move for dismissal of its Chapter 11 case; (c) the Debtor would give Movant a deed in lieu of foreclosure on the Property; (d) the Movant would be paid $450,000 in exchange for a full release of the guaranties against the Debtor's three principals ($100,000 of which was already in escrow); and (e) the Movant would release liens it had on certain property in Dallas owned by an affiliate of the Debtor, known as SCH-Trident, which affiliate is in a bankruptcy case pending before Judge Harlin Hale. To be clear, no motion to approve a compromise is before this court. And no motion asking for permission to transfer the Property by deed in lieu of foreclosure to the Movant is pending. Only the Movant's Motions are now before the court (and there is a pending

motion to dismiss case that was not yet set for hearing). When the Debtor's counsel was asked what happened to the buyers on the sale motions, he said that they did not seem ready, willing, and able to close and were not prepared to come to court and testify that they were. Apparently, one of the now-reluctant buyers is a daughter of one of the principals of the Debtor.

One last interesting fact is that the Debtor's principal, Rajiv Chhabra, represented during this case (at a hearing on May 5, 2014, when asked by the court) that the Property was acquired for $5.4 million. This was in year 2007. Thus, seven years ago, before any construction on the Property, this is how much money was paid to acquire the undeveloped Property.

The court is now confronted with whether there is cause to lift the stay. *See* 11 U.S.C. § 362(d). The Movant has the burden of proving no equity. The party opposing stay relief has the burden on all other issues. *See* 11 U.S.C. § 362(g).

### III. The Value Conundrum.

The court finds that Movant did not meet its burden of proof on the issue of there being no equity in the Property. First, the Movant's appraiser provided testimony that the Property at the current time is worth anywhere from $8,870,000 to $9,550,000 "as is," assuming a 12-24 month exposure period and holding costs, but, assumed a value of $10,150,000 (if there was completion of the finish out on Building 1, and again assuming a 12-24 month exposure period). *See* Mov. Ex. C. The appraiser assumed that the Property would be marketed as individual condominium units. Notably, the appraiser had very few "comparables," and the "comparables" were not very "comparable" in the court's view. Specifically, page 97 of the Appraiser's Appraisal (Mov. Ex. C), reflected that five comparables were used, and these comparables were simply comparables for ***individual units*** of condominium projects that have been sold in the recent past, and the Appraiser used those sales to derive a likely price per unit of the Units in

Building 1.  However, there are numerous reasons why these were not very compelling as comparables.  First, three out of the five comparables were for *retail* condominiums; but two of the five comparables were for *office* condominiums.  Office condominiums would seem to be a somewhat different market niche.  Moreover, two of the retail condominiums were built in *1970– thus, were more than 40 years old* (as opposed to being newly constructed like the Debtor's Units).  Moreover, only three of the five condominium unit comparables (two of which were the ones built in 1970) were in the same area of Houston.  Moreover, the Appraiser did not assume that there may be comparable aggregate *projects* out there with unleased or unsold units that had been sold recently.  The court only mentions this latter point because, it seems plausible to the court, that some investor might be interested in buying this Property *intact*, and using it for slightly different purposes than for long-term marketing/selling of the individual units one-by-one.  In any event, whether this latter point was really a troublesome omission in the data or not, the Appraiser testified at one point that he thought *$532,000 per Unit* was an appropriate average price.  Multiplying this figure times 17 Units yields $9,044,000.  The Appraiser testified that he thought the Adjacent Real Property was worth $3,465,000.  Adding this together yields a value of $12,509,000.  Recall also that the Debtor's sale motions (recently withdrawn) for five of the Units involved an average of $579,026 per unit.  In any event, the big unknown is the time and carrying cost of marketing the Property to yield these possible values.

   Bottom line, the Movant had the burden to show no equity in the Property and the court does not think Movant quite met its burden. The court is not fully convinced that there is no equity in the Property and certainly thinks there may be an equity cushion above what the Movant is owed.

### IV.     Other Cause to Condition Continuation of the Automatic Stay:  Lack of Adequate Protection.

However, there is nevertheless other cause to grant some relief from the automatic stay (or, really, condition the stay), based on other facts.  Specifically, the Debtor has not maintained adequate insurance on the Property and the evidence was compelling that the Property is not secure and is not being maintained from vandals and other harm and decline (Mov. Ex. B).  The Property appears from the credible evidence to be at a very real risk of rapidly declining in value.  Also, there is no reorganization in prospect under the leadership of the Debtor–at least partly due to the fact that the Debtor is neglecting its fiduciary duties.  Specifically, the court was troubled that the Debtor's principals are able and willing to fund a $100,000 escrow to get a release of their guarantees from the Movant, as was announced in court, but cannot afford insurance, security, and other safeguarding of the Property.  The Debtor has no business being a debtor-in-possession, with this approach.  The court acknowledges that the Debtor filed a Motion to Dismiss around the same time apparently as the escrow was funded to get the guarantors "off the hook."  But that still does not excuse the fact that, for three months, the Debtor did not maintain the Property as a fiduciary, jeopardizing the interests of the creditors who were the stakeholders who were to be primarily considered, not the equity member/guarantors.  The court believes that all lienholders are at risk here, since the debtor-in-possession is not adequately protecting their interests.

Accordingly, it is

**ORDERED** that, while there is "cause" under section 362(d), to terminate, modify or condition the stay–that "cause" being lack of adequate protection– the court will *condition* the continuance of the stay, *not terminate* it–and the continuation of the stay will be conditional on the following: (a) the court will *sua sponte* appoint a Chapter 11 Trustee to adequately protect

10

Movant and all lienholders and interestholders; (b) the Chapter 11 Trustee will report to this court in 45 days whether he/she believes there is equity in the Property or there is a strategy that might be pursued to maximize value in the Bankruptcy Case or whether, instead, the Property should be abandoned; (c) for the sake of clarity, the Chapter 11 Trustee will be the only party with authority to act for the Debtor and the only party with authority to sell, abandon, or otherwise dispose of the Property and is the only party with authority to reach compromises or obtain financing (any party who wishes to loan money to the estate or offer funds to purchase Property should deal with the Chapter 11 Trustee);[2] (d) the court will set a status conference in roughly 45 days and will also set a further hearing at the same time on the Movant's Motions and on the motion to dismiss, and the court may lift the stay, after that hearing, to at least allow Movant to post the Property for foreclosure, if there is no sale, reorganization in prospect, or other way for the Chapter 11 Trustee to offer adequate protection to Movant and other parties in interest; (e) the court may also lift the stay *sua sponte* for all lienholders at the aforementioned status conference, if the court believes it is necessary to adequately protect other lienholders; (f) for now, the court is deferring a ruling on whether the Debtor is a single asset real estate debtor (the court requires more briefing and argument on the subject), but in the event the Debtor is, the court believes there is cause to relieve the estate from making monthly payments to Movant until the Chapter 11 Trustee has had the opportunity to take control of the Debtor and assess whether a plan or sale(s) are feasible and/or whether monthly payments to the Movant are feasible. The court will consider this issue again at the status conference in 45 days.

### END OF FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER ###

---

[2] AZA announced at the third day of the Hearing on the Motions that it was interested in both funding a Chapter 11 Trustee's expenses, possibly up to $100,000, and that it was also interested in buying multiple Units.